**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KYLE HANAGAMI, an individual,

*Plaintiff-Appellant*,

v.

EPIC GAMES, INC., a North Carolina corporation; DOES, 1 through 10, inclusive,

*Defendants-Appellees*.

No. 22-55890

D.C. No.
2:22-cv-02063-
SVW-MRW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted August 16, 2023
Anchorage, Alaska

Filed November 1, 2023

Before: Mary H. Murguia, Chief Judge, and Richard A.
Paez and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Paez

# SUMMARY[*]

## Copyright

The panel reversed the district court's dismissal of an action under the Copyright Act and remanded for further proceedings on claims of direct and contributory infringement of a choreographic work.

Choreographer Kyle Hanagami claimed that Epic Games, Inc., the creator of the videogame *Fortnite*, infringed the copyright of a choreographic work when the company created and sold a virtual animation, known as an "emote," depicting portions of the registered choreography.

The panel held that, under the "extrinsic test" for assessing substantial similarity, Hanagami plausibly alleged that his choreography and Epic's emote shared substantial similarities. The panel held that, like other forms of copyrightable material such as music, choreography is composed of various elements that are unprotectable when viewed in isolation. What is protectable is the choreographer's selection and arrangement of the work's otherwise unprotectable elements. The panel held that "poses" are not the only relevant element, and a choreographic work also may include body position, body shape, body actions, transitions, use of space, timing, pauses, energy, canon, motif, contrast, and repetition. The panel concluded that Hanagami plausibly alleged that the creative choices he made in selecting and arranging elements of the choreography—the movement of the limbs, movement of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the hands and fingers, head and shoulder movement, and tempo—were substantially similar to the choices Epic made in creating the emote.

The panel held that the district court also erred in dismissing Hanagami's claim on the ground that the allegedly copied choreography was "short" and a "small component" of Hanagami's overall work. The panel declined to address the issue whether the work was entitled to broad or only thin copyright protection.

**COUNSEL**

David L. Hecht (argued), Maxim Price, and Kathryn L. Boyd, Hecht Partners LLP, New York, New York, for Plaintiff-Appellant.

Dale Cendali (argued) and Joshua L. Simmons, Kirkland & Ellis LLP, New York, New York; Yungmoon Chang, Kirkland & Ellis LLP, Los Angeles, California; for Defendants-Appellees.

**OPINION**

PAEZ, Circuit Judge:

Dance is one of the oldest forms of human expression. Recognition of dance as a form of copyrightable subject matter, however, is a far more recent development. While early versions of the Copyright Act extended statutory protection to dramatic works and musical compositions, dance long remained outside the purview of copyright law. In 1976, Congress for the first time extended explicit copyright protection to "choreographic works," bringing dance in line with the other performing arts. Nonetheless, the field of choreography copyright has remained a largely undefined area of law. Few courts have had occasion to consider the scope of copyright protections for choreographic works. This appeal presents us with that novel opportunity. We consider a choreographer's claims that Epic Games, Inc. ("Epic"), the creator of a popular videogame, infringed the copyright of a choreographic work when the company created and sold a virtual animation depicting portions of the registered choreography.

Plaintiff Kyle Hanagami ("Hanagami") is a celebrity choreographer who owns a validly registered copyright in a five-minute choreographic work. Epic is the developer of *Fortnite*, a video game featuring an extensive virtual world where players represent themselves using avatars. *Fortnite* players can customize their avatars by purchasing "emotes," which are virtual animations that players use to celebrate or dance in the game. Hanagami sued Epic, alleging the company released an emote that copies a distinct, four-count portion of his registered choreographic work.

To prevail on a claim of copyright infringement, a plaintiff must show that his original work and the allegedly infringing work are "substantially similar." At the motion to dismiss stage, the question is whether the plaintiff has plausibly alleged substantial similarity between the original work and the allegedly infringing work. The dispute in this case thus turns on how to properly apply the substantial similarity test in the context of choreographic works to determine whether Hanagami has plausibly alleged that his choreographic work and Epic's emote are substantially similar.

In moving to dismiss, Epic argued that Hanagami failed to state a claim because the allegedly copied dance steps were not protectable elements of Hanagami's work, and thus not substantially similar to Epic's emote. Hanagami argued that the dance steps in question were identical to Epic's emote and comprised the most recognized portion of his work.

The district court agreed with Epic and dismissed Hanagami's copyright claims on the ground that Hanagami failed to plausibly allege that Epic's emote was substantially similar to his registered choreography. The court concluded, as a matter of law, that Hanagami lacked protection for the individual "poses" in the choreography and that he could not claim protection over the allegedly copied portion of choreography because it was closer to an uncopyrightable "short" routine and comprised a "small component" of Hanagami's choreography. Comparing the entirety of Hanagami's registered choreography to Epic's emote, the court concluded there was no substantial similarity between the two works.

We conclude the district court erred in its application of the substantial similarity test as Hanagami plausibly alleged that his choreography and Epic's emote share substantial similarities.  We thus reverse and remand for further proceedings.

## I.

### A.

Plaintiff Kyle Hanagami is a Los Angeles-based choreographer with a star-studded resume.  His choreography has been used by numerous renowned artists, including Jennifer Lopez, Britney Spears, and Justin Bieber, and he has served on the faculty at three of the top dance studios in Los Angeles.  Outside of the studio, Hanagami has partnered with globally recognized brands like Nike, Disney, Google, and Netflix.  Hanagami also has a substantial presence on social media.  As alleged in the Complaint, filed on March 29, 2022, Hanagami had 4.54 million YouTube subscribers (with over 857 million total video views), over 1.6 million Instagram followers, and over 1.3 million TikTok followers.

On November 11, 2017, Hanagami published a YouTube video titled "CHARLIE PUTH – How Long | Kyle Hanagami Choreography" (the "How Long Video").[1]  The video contains a five-minute dance performed to the song "How Long" by singer Charlie Puth.  The dance contains about 480 counts of choreography, consisting of ninety-six

---

[1] The How Long Video is available via Hanagami's YouTube channel. *See* Kyle Hanagami, *CHARLIE PUTH – How Long | Kyle Hanagami Choreography*,        YouTube        (Nov.        11,        2017), https://www.youtube.com/watch?v=iW2yUrXXRTI [https://perma.cc/L3DH-MS3Z].

counts repeated by five different groups of dancers. As of May 2022, the How Long Video had garnered nearly 36 million views on YouTube.

Epic is the creator and developer of the *Fortnite* video game. Since its release in July 2017, *Fortnite* has become one of the most popular video games ever, with revenue exceeding $10 billion. *Fortnite* is a free-to-play game featuring an extensive virtual world where players can explore, build, and battle against each other via player-to-player combat. *Fortnite* also provides other entertainment options within its online platform, including virtual concerts performed by celebrity artists.

Epic generates revenue from *Fortnite* by maintaining an in-game marketplace for entertainment content. Within the marketplace, players use real money to purchase *Fortnite*'s virtual currency, called "Vinderbucks" or "V-Bucks," which can be used to buy in-game customizations.[2] For example, players can use V-Bucks to buy clothing and accessories for their virtual avatars, which represent the players during gameplay.

*Fortnite* players can also purchase virtual animations, known as "emotes," for their avatars to perform. Emotes are animated movements or dances that players use in celebration of a victory or during virtual concerts. The cost of an emote varies from 200 V-Bucks to 800 V-Bucks, depending on how "rare" the emote is considered within the game.

---

[2] *Fortnite* offers four pricing levels for purchasing V-Bucks, ranging from 1,000 V-Bucks for $9.99 to 13,500 V-Bucks for $99.99.

In August 2020, Epic released Chapter 2, Season 3 of *Fortnite*, which included a new emote called "It's Complicated."[3]     Hanagami claims that the "It's Complicated" emote "contains the most recognizable portion of [his] . . . [c]horeography]" from the How Long Video.  The emote consists of 16 counts of movement, four of which are alleged to have been copied from Hanagami's work.[4]  Hanagami's choreography repeats the four counts in question several times throughout the How Long Video, corresponding to the song's chorus.  The "It's Complicated" emote is not set to the song "How Long" and is instead accompanied by an original soundtrack without lyrics.  The "It's Complicated" emote was priced at 500 V-Bucks, the equivalent of five U.S. dollars.

In February 2021, Hanagami applied for a copyright registration for his choreography in the How Long Video.  The Copyright Office approved the application, and the choreography was registered as a choreographic work on February 20, 2021 (hereinafter, the "Registered Choreography").   The registration is limited to the choreography in the video, not the music or audiovisual elements.

---

[3] A video of the "It's Complicated" emote, as performed by an avatar in *Fortnite*'s marketplace, is available online.  *See* Insane broz, *It's Complicated Emote | Fortnite – Battle Royale*, YouTube (Mar. 31, 2020), https://www.youtube.com/watch?v=ye8BYIzPxgQ [https://perma.cc/W55A-K88L].

[4] Hanagami's counsel prepared a side-by-side video of the allegedly copied counts from Hanagami's choreography and Epic's emote.  *See* David Hecht, *Fortnite Infringement of Kyle Hanagami Choreography*, YouTube          (Mar.          28,          2022), https://www.youtube.com/watch?v=vXYDr9o_FJY [https://perma.cc/8956-5LJJ].

**B.**

In this action, Hanagami alleges that Epic's "It's Complicated" emote infringes Hanagami's Registered Choreography. Relevant to this appeal, Hanagami brings claims for direct copyright infringement and contributory copyright infringement.[5] Epic moved to dismiss, arguing that Hanagami failed to state a copyright claim because the allegedly copied dance steps were not protectable and the works were not substantially similar.

The district court granted Epic's motion to dismiss. Addressing Hanagami's copyright claims, the court first found that choreography is composed of "a number of individual poses" that are not protectable "when viewed in isolation." The court determined that the overall "steps" Epic allegedly copied—which the court described as "a two-second combination of eight bodily movements, set to four beats of music"—were not protectable under the Copyright Act because they were only a "small component" of Hanagami's work. Relying on guidance from the United States Copyright Office, the court reasoned that there exists a "continuum between copyrightable choreography and uncopyrightable dance." *See* U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 805.1 (3d ed. 2021) (*Compendium*) (advising that "social dance steps and simple routines" are not copyrightable).[6] The court, having concluded that the dance steps were not protectable on their own, then concluded that Hanagami was entitled to

---

[5] Hanagami also brought an unfair competition claim under California Business and Professions Code § 17200, et seq. The district court dismissed that claim, and Hanagami does not appeal that ruling.

[6] All subsequent textual references to the Compendium are to the third edition, except where otherwise noted.

protection "only for the way the Steps are expressed in his Registered Choreography" as a whole, "i.e., in the entire five-minute work."

The court proceeded to evaluate the similarities between the Registered Choreography as a whole and the emote. The court determined that "[t]he two works contain a series of different poses performed in different settings and by different types of performers" and that Hanagami had identified "no other similar creative elements" between them, apart from the unprotected poses. Concluding that the works were not substantially similar as a matter of law, the court dismissed Hanagami's copyright claims.

## II.

We review de novo a district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). *See Wilson v. Lynch*, 835 F.3d 1083, 1090 (9th Cir. 2016). When reviewing the complaint, we take all allegations of material fact as true "and decide whether the complaint articulates 'enough facts to state a claim to relief that is plausible on its face.'" *Starz Ent., LLC v. MGM Domestic Television Distrib., LLC*, 39 F.4th 1236, 1239 (9th Cir. 2022) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III.

We begin by discussing the history of copyright protection for choreographic works. We then turn to Hanagami's claims.

## A.

The 1976 Copyright Act was the first federal copyright statute to provide express protection for "choreographic

works."  17 U.S.C. § 102(a)(4); *Horgan v. Macmillan, Inc.*, 789 F.2d 157, 160 (2d Cir. 1986).  The Act was a significant departure from its predecessor, the 1909 Copyright Act. Under the 1909 Act, choreographers were only permitted to register their works under the subject of "dramatic composition," which required that the dance "depict some story or emotion."  Barbara A. Singer, *In Search of Adequate Protection for Choreographic Works*: *Legislative and Judicial Alternatives vs. the Custom of the Dance Community*, 38 U. Mia. L. Rev. 287, 298 (1984).  By limiting eligibility to dramatic works, the 1909 Act effectively excluded abstract and non-literary choreography from copyright protection.

Over the years, there were numerous proposals to amend the 1909 Act to provide broader protections for choreography, but none were successful.  *Horgan*, 789 F.2d at 160.  In 1961, the Copyright Office took heed of the issue. It submitted a report to Congress suggesting a revision to the 1909 Act to protect abstract forms of choreography, explaining that there was "no reason why an 'abstract' dance, as an original creation of a choreographer's authorship, should not be protected as fully as a traditional ballet presenting a story or theme."  *Copyright Law Revision: Rep. of the Register of Copyrights on the General Revision of the U.S. Copyright Law*, 87th Cong., 1st Sess., 17 (H. Judiciary Comm. Print 1961).  The report recommended that Congress create a separate category for choreographic works within the statute.  *Id.*

Congress followed that recommendation and when it enacted the 1976 Act, it codified "choreographic works" as one of the "original works of authorship" subject to copyright protection.  17 U.S.C. § 102(a)(4).  With this change, choreography finally "achieved legal recognition as

a separate, viable form of art."**[7]**   Singer, *supra*, at 288–89. Choreographers thus have "exclusive rights" to "reproduce the copyrighted work in copies," "prepare derivative works," "distribute copies" of the work "by sale," "perform the copyrighted work publicly," and "display the copyrighted work publicly."   17 U.S.C. § 106(1)–(5); *see also Horgan*, 789 F.2d at 161.

The Act, however, does not define the term "choreography," and Congress left little clue about what it might mean.  *See Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032, 1043 (9th Cir. 2015). Indeed, Congress considered the term "choreographic work[]" to have a "fairly settled" meaning.  *Id.* (citing H.R. Rep. No. 94-1476, at 53 (1976)).   On this point, the legislative history explains that Congress found it unnecessary to "specify that 'choreographic works' do not include social dance steps and simple routines."  *Id.* (citing H.R. Rep. No. 94-1476, at 53–54 (1976)).

Although more than forty years have passed since the 1976 Act's enactment, few courts have addressed federal copyright protections for choreographic works.   *See Bikram's Yoga Coll. of India*, 803 F.3d at 1043 (agreeing that copyright protection for choreography remains "an uncharted area of the law") (quoting *Horgan*, 789 F.2d at 160)).   The most famous case in this area is *Horgan v. Macmillan, Inc.*, in which the Second Circuit considered whether photographs of a ballet could infringe the copyright on the choreography of the ballet.  789 F.2d at 158.  In that case, Macmillan published a book of color photographs of the New York City Ballet Company's production of The

---

[7] For additional background on the history of statutory protections for choreography, see *Horgan*, 789 F.2d at 161.

Nutcracker. *Id.* at 158–59. The book portrayed, through text and photos, the story and history of The Nutcracker ballet. *Id.* The estate of George Balanchine, who famously choreographed the production, sued for copyright infringement. *Id.* at 158. The district court found that Macmillan had not infringed the copyright for the ballet because the photographs did not capture "the flow" of the dancer's steps and "[t]he staged performance could not be recreated" from the photographs. *Id.* at 160.

On appeal, the Second Circuit reversed and remanded, concluding that the district court erroneously held that still photographs could not infringe a choreographic work. *Id.* at 162–63. To reach this conclusion, the Second Circuit looked to the Compendium of U.S. Copyright Office Practices ("Compendium II") as persuasive authority.[8] *Id.* at 161–62. Notably, the Second Circuit quoted the definition of "choreography" in the Compendium II, which described the term as "the composition and arrangement of dance movements and patterns." *Id.* at 161 (quoting U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 450.01 (2d ed. 1984) (*Compendium II*)).[9]

---

[8] The Compendium is a manual published by the Copyright Office. It provides instruction to agency staff and guidance to the general public on the Copyright Office's requirements, regulations, and legal interpretations. *See* Compendium, Introduction, at 1.

[9] The Second Circuit addressed another choreography copyright claim in *Martha Graham School & Dance Found., Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 466 F.3d 97 (2d Cir. 2006). There, the court considered a dispute over which entity was the rightful owner of choreographic works produced by the famous dancer Martha Graham. *Id.* at 99. The court held that there was sufficient evidence to establish that Graham had assigned copyrights to the dances to her foundation, but it did not reach the underlying question of copyright infringement, nor

We also briefly addressed the subject of choreography in *Bikram's Yoga College of India*. 803 F.3d at 1043. There, we considered whether a sequence of yoga poses could be subject to copyright protection as a choreographic work. *Id.* We held that the yoga sequence was not copyrightable as a choreographic work because it was "an idea, process, or system to which copyright protection may '[i]n no case' extend." *Id.* at 1043–44 (citing 17 U.S.C. § 102(b)). Although we cited the Compendium II in our reasoning, we explained that we did not need to decide "whether to adopt the Copyright Office's definition of 'choreographic work' or fashion another on our own" because "[e]ven if the [s]equence could fit within some colloquial definitions of dance or choreography, it [would] remain[] a process ineligible for copyright protection." *Id.* at 1044.

Today, we adopt the Compendium's definitions of "choreography" and "dance."[10]  The Compendium defines choreography as "the composition and arrangement of a related series of dance movements and patterns organized into a coherent whole."  Compendium § 805.1 (internal quotations and citations omitted).  It defines dance as the "static and kinetic succession[] of bodily movement in certain rhythmic and spatial relationships." *Id.* § 805.4(A) (quoting *Horgan*, 789 F.2d at 161).  Under these definitions, "choreography is a subset of dance," but the two terms are "not synonymous." *Id.* §§ 805.5(B)(3), 805.1.  The

---

did it elaborate on the definition or characteristics of a choreographic work. *See id.* at 99–100.

[10] Although we are not bound by the Compendium, we defer to the Copyright Office when its interpretation of a term has the "power to persuade." *See Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038, 1042 (9th Cir. 2014), *as amended* (July 9, 2014) (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)).

Compendium outlines several elements that choreographic works typically contain, "although the presence or absence of a given element is not determinative of whether a particular dance constitutes choreography." *Id.* § 805.2. These features include "rhythmic movement in a defined space," "compositional arrangement," "musical or textual accompaniment," "dramatic content," "presentation before an audience," and "execution by skilled performers." *Id.* § 805.2(A)–(F) (cleaned up).

The Compendium does not draw a bright line distinction between copyrightable choreography and uncopyrightable dance; instead, there is a continuum on which "[m]any works fall somewhere in between." *Id.* § 805.5(B). Still, there are limitations on what types of movements are copyrightable as choreography. "Individual movements or dance steps by themselves are not copyrightable, such as the basic waltz step, the hustle step, the grapevine, or the second position in classical ballet." *Id.* § 805.5(A). Nor will the Copyright Office register "short dance routines consisting of only a few movements or steps with minor linear or spatial variations, even if the routine is novel or distinctive." *Id.* Individual dance elements "are not copyrightable for the same reason that individual words, numbers, notes, colors, or shapes are not protected"—they are the "building blocks of choreographic expression" from which all choreographic works are built. *Id.*

## B.

With this background in mind, we turn to Hanagami's claims against Epic. To state a claim for copyright infringement against Epic, Hanagami must show that (1) he owns a valid copyright in his choreography, and (2) Epic copied protected aspects of his work. *Feist Publ'ns, Inc. v.*

*Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Hanagami's ownership of a valid copyright is not challenged on appeal, so we do not address the first prong.

To demonstrate the second prong—that Epic copied protected aspects of Hanagami's work—Hanagami must plausibly allege both (1) copying and (2) unlawful appropriation.  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled in part by Skidmore v. Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc).  A plaintiff can demonstrate copying "by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying."  *Id.* "Similarities probative of copying" include similarities that are more likely attributable to copying, rather than "coincidence, independent creation, or prior common source."  *Skidmore*, 952 F.3d at 1064 (first quoting *Rentmeester*, 883 F.3d at 1117; and then quoting *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010)).  Copying does not require demonstrating a high degree of similarity; the plaintiff need only show that there are "similarities one would not expect to arise if the two works had been created independently." *Rentmeester*, 883 F.3d at 1117.  Here, it is undisputed that Hanagami plausibly alleged the "copying" component of his claim.

Unlawful appropriation is different.  Plaintiffs must demonstrate that the works share *substantial* similarities. *Skidmore*, 952 F.3d at 1064.  We require a showing of unlawful appropriation because the Act does not forbid copying writ large.  Copyright, rooted in Congress's power to "promote the Progress of Science and useful Arts," U.S. Const. art. I § 8, cl. 8, exists to "encourage[] others to build freely upon the ideas and information conveyed by a work."

*Feist*, 499 U.S. at 349.  Copyright protection thus only covers an artist's expression, not the idea underlying that expression.  *See id.*; *see also* 17 U.S.C. § 102(b) (stating that copyright protection does not "extend to any idea, procedure, process, system, method of operation, concept, principle or discovery").  Accordingly, a defendant cannot be held liable for copying only "ideas" or "concepts" from a plaintiff's work.  Instead, to be liable for copyright infringement, a defendant "must . . . copy enough of the plaintiff's expression of those ideas or concepts to render the two works 'substantially similar.'"  *Rentmeester*, 883 F.3d at 1119 (quoting *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 913–14 (9th Cir. 2010)).

Our circuit uses a two-part test to assess substantial similarity.  The first part, known as the "extrinsic test," "assesses the objective similarities of the two works, focusing only on the protectable elements of the plaintiff's expression."  *Rentmeester*, 883 F.3d. at 1118 (citing *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002)).  The second part, referred to as the "intrinsic test," "test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008) (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir.1994)).  District courts apply only the extrinsic test at the pleadings stage, "as the intrinsic test is reserved exclusively for the trier of fact."  *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018).  The district court's application of the extrinsic test is the primary issue on appeal.

### 1.  Substantial Similarity

Hanagami argues the district court erred in its application of the extrinsic test when it determined that the Registered Choreography and the "It's Complicated" emote were not substantially similar.  He first challenges the court's process for determining the protectable and unprotectable elements of his choreography.  The court concluded that choreography is composed of "a number of individual poses" that are unprotectable when viewed in isolation.  The court also ruled that the collection of "steps" Epic allegedly copied—a two-second combination of eight bodily movements, set to four beats of music, performed ten times throughout the five-minute registered work—were unprotectable as a whole. Hanagami challenges the conceptual approach of reducing choreography to "poses," arguing that choreography is much more than a "static collection of poses," and that the court failed to consider many other "expressive elements of [the] choreography."

We agree with Hanagami.  The district court's approach of reducing choreography to "poses" is fundamentally at odds with the way we analyze copyright claims for other art forms, like musical compositions.  We reverse and remand to the district court on this basis.

### a.  *The district court erred in analyzing the elements of choreography.*

To apply the extrinsic test, courts must first distinguish between protectable and unprotectable elements, and "ask only whether the protect[a]ble elements in two works are substantially similar."  *L.A. Printex Indus. Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 849 (9th Cir. 2012).  This process is referred to as "filtering."  *See, e.g.*, *Williams*, 895 F.3d at 1117.  But we have long recognized that "[c]ertain

types of works can be dissected into protected and unprotected elements more readily than others." *Rentmeester*, 883 F.3d at 1119.  For example, a photograph cannot be easily broken down into protected and unprotected elements because none of the "various creative choices the photographer made in composing the image—choices related to subject matter, pose, lighting, camera angle, depth of field, and the like" would receive "copyright protection when viewed in isolation." *Id.* at 1119.

To account for this, we also employ a "selection and arrangement" approach to assess substantial similarity.  This approach protects the "*particular* way in which the artistic elements form a coherent pattern, synthesis, or design."[11] *Skidmore*, 952 F.3d at 1074; *see Swirsky v. Carey*, 376 F.3d 841, 848 (9th Cir. 2004) ("[A] substantial similarity can be found in a combination of elements, even if those elements are individually unprotected.").

Like other forms of copyrightable material, choreography is composed of various elements that are unprotectable when viewed in isolation.  An individual, stand-alone dance movement, such as a plie, is equivalent to an "idea" that is not protectable by copyright.  As a result, subsequent choreographers can use the same individual movements to produce new choreographic works of their own, as long as the new compositions are not substantially similar to the copyrighted work.  Similarly, a choreographer

---

[11] "Filtering" and "selection and arrangement" are not truly distinct tests; they are different ways of evaluating whether a particular work infringed upon protected expression.  *See Skidmore*, 952 F.3d at 1074.  One appears to gauge whether protected elements of a work were unlawfully copied, while the other addresses whether a protected expression, as a whole, was unlawfully copied.  *See id.*

cannot claim protection over the use of tempo, transitions, or rhythm in a choreographic work. The uncopyrightable elements of a dance instead function as "the building blocks for a choreographer's expression, in much the same way that words and short phrases provide the basic material for writers." Compendium § 805.4(D).

What *is* protectable is the choreographer's "selection and arrangement of the [work's] otherwise unprotected elements." *Cf. Rentmeester*, 883 F.3d at 1120 (determining copyrightability of a photograph). Thus, while individual dance movements may not receive protection, their "[o]riginal selection, coordination, and arrangement . . . may be protect[a]ble expression." *See L.A. Printex*, 676 F.3d at 849 (determining copyrightability of a floral textile design). Again, this approach is consistent with copyright in other contexts. *See Metcalf v. Bocho*, 294 F.3d 1069, 1074 (9th Cir. 2002) (explaining that individual musical notes are not protected but their arrangement may be), *overruled on other grounds by Skidmore*, 952 F.3d at 1051; *Rentmeester*, 883 F.3d at 1120 (explaining that individual elements of a photograph are not protected but their combined selection and arrangement may be).

We do not, however, have a "well-defined standard for assessing when similarity in selection and arrangement becomes 'substantial,'" largely because it is a fact-driven and context-dependent inquiry. *Rentmeester*, 883 F.3d at 1121. We have suggested generally that the "selection and arrangement of elements must be similar enough that 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them.'" *Id.* (citing *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)).

The district court correctly recognized that choreography falls within a selection-and-arrangement framework, but it erred at the first step of that analysis: breaking down the elements of the choreographic works.  Identifying the elements of choreographic works is admittedly not an easy task, and there is little guidance for courts in this context. "[N]either the Copyright Act nor the Copyright Office's regulations clearly specify what constitutes the expressive element of a choreographic work."  Joi Michelle Lakes, *A Pas de Deux for Choreography and Copyright*, 80 N.Y.U. L. Rev. 1829, 1841 (2005).  Consequently, it is "unclear when a work moves from public domain steps to copyrightable expressive choreography." *Id.* at 1847.

We nonetheless agree with Hanagami that "poses" are not the only relevant element underlying a choreographic work.  Hanagami persuasively argues that there are several other "expressive element[s] present in choreography," including "body position, body shape, body actions, transitions, use of space, timing, pauses, energy, canon, motif, contrast, [and] repetition."  These more discrete and technical elements are conceptually similar to elements we recognize in other copyright contexts, particularly the field of music.

In music copyright cases, we routinely dissect and analyze many musical elements, including "melody, harmony, rhythm, pitch, tempo, phrasing, structure, chord progressions, and lyrics."  *Swirsky*, 376 F.3d at 849 (collecting cases across circuits analyzing different elements of musical compositions).  In *Skidmore*, for example, we considered a plaintiff's allegations that the song *Stairway to Heaven* copied a combination of five musical elements from the plaintiff's work: minor chromatic line and associated chords; duration of pitches of minor chromatic line; melody

placed over the descending chromatic line consisting of combination of arpeggios and two-note sequences; rhythm of steady eighth note beats; and pitch collection. *Skidmore*, 952 F.3d at 1074.   And in *Williams,* we assessed the combined presence of eight musical elements that plaintiffs claimed rendered the two songs substantially similar.  895 F.3d at 1117–18 (assessing alleged similarities between two songs, including the bass lines, keyboard parts, signature phrases, hooks, "Theme X," bass melodies, word painting, and placement of the rap and "parlando" sections in the two songs); *see also Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (assessing five musical elements), *overruled on other grounds by Skidmore*, 952 F.3d at 1051. In fact, we have held that it would be error for a district court to "disregard chord progression, key, tempo, rhythm, and genre" when assessing a musical chorus because "no approach can completely divorce pitch sequence and rhythm from harmonic chord progression, tempo, and key, and therefore support a conclusion that compositions are dissimilar as a matter of law." *Swirsky,* 376 F.3d at 848.

We see no reason to treat choreography differently.  To analogize from music to dance, reducing choreography to "poses" would be akin to reducing music to just "notes." Choreography is, by definition, a related series of dance movements and patterns organized into a coherent whole. The relationship between those movements and patterns, and the choreographer's creative approach of composing and arranging them together, is what defines the work.   The element of "poses," on its own, is simply not dynamic enough to capture the full range of creative expression of a choreographic work.

In holding that elements beyond mere poses can exist, we do not suggest that the same elements will be present in

every choreographic work.  Nor is it necessary to specify a discrete universe of elements from which a choreographic copyright infringement claim can be built.  In music, "each allegation of infringement [is] unique," and "[t]here is no one magical combination of . . . factors that will automatically substantiate a . . . suit." *Swirsky*, 376 F.3d at 849.  The same is true for choreography.  Choreographic works could plausibly contain multiple unique elements, and those elements can and will change depending on the work in question.[12]  The task for courts, then, is to compare the selection and arrangement of elements in the registered choreographic work with that in the allegedly infringing work.  At the motion-to-dismiss stage, the court must only consider whether the plaintiff has plausibly alleged that the two works share substantial similarities.

In this case, Hanagami alleged that Epic copied several elements of his choreography, most of which cannot be captured by reviewing static poses.  He alleged that Epic copied "without limitation, the footwork, movement of the limbs, movement of the hands and fingers, and head and shoulder movement covered by the Registered Choreography."  He averred that "the tempo is the same in both the Registered Choreography and the emote." Hanagami also argued that the works contain at least eight of the same "body shapes/positions" and share the same

---

[12] We note, however, that the district court's reduction of choreography to "poses" was particularly problematic because choreography is tied closely to movement.  Static poses cannot possibly capture the flow of movement that is integral to choreography as a form of art.  *See* Lakes, *supra*, at 1848 (noting that "movement itself is the choreographer's means of expression . . . inher[ing] in how the choreographer progresses the dancers from position to position, not necessarily in the mere order of the positions themselves").

"pathways/transitions." The district court erred by ignoring these elements in its application of the substantial similarity test.

Because the district court failed to assess the discrete combination of elements of the Registered Choreography, it erred in deciding as a matter of law at the motion-to-dismiss stage that the two works were not substantially similar. Taking the allegations in Hanagami's complaint as true, he has plausibly alleged substantial similarity under the extrinsic test. Specifically, he has plausibly alleged that the creative choices he made in selecting and arranging elements of the choreography—the movement of the limbs, movement of the hands and fingers, head and shoulder movement, and tempo—are substantially similar to the choices Epic made in creating the emote. A plaintiff need not set forth detailed factual allegations about the elements of choreography to survive a motion to dismiss. *See Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 951 (9th Cir. 2019). The facts alleged in the complaint must simply "'be enough to raise a right to relief above the speculative level' and to 'state a claim to relief that is plausible on its face.'" *Id.* at 951 (citing *Bell Atl. Corp.*, 550 U.S. at 555, 570). Hanagami met this burden.

Indeed, it is generally disfavored for copyright claims to be dismissed for lack of substantial similarity at the pleading stage. In many cases, "[a]pplication of '[t]he extrinsic test requires analytical dissection of a work and expert testimony'" because most judges are not sufficiently trained in the specifics of the art form at issue to make reliable conclusions about similarity. *Williams*, 895 F.3d at 1119 (quoting *Swirsky*, 376 F.3d at 845). This does not mean all copyright claims must proceed through discovery to receive a fair shake. We have occasionally affirmed the dismissal of

copyright infringement claims under Rule 12(b)(6) when "nothing disclosed during discovery" could change the court's conclusion that the works are not substantially similar. *Rentmeester*, 883 F.3d at 1123. Likewise, some works are so dissimilar by plain sight that any person observing them could confidently conclude that they do not share substantial similarities.

This is not such a case. Hanagami has plausibly alleged substantial similarity, and the district court erred in dismissing his claims on the grounds provided. We reverse and remand for further proceedings consistent with this opinion.

## b. The district court erred in dismissing Hanagami's claim because the choreography was "short" and a "small component" of Hanagami's overall work.

In addition to deciding that the poses in Hanagami's choreography were unprotectable, the district court also reasoned that Hanagami could not claim protection over the allegedly copied "Steps" as a whole, which the court defined as "two seconds, four beats of music, or eight body positions, repeated ten times throughout the registered choreography." In so holding, the district court reasoned that the Copyright Office would be unlikely to register the Steps as a discrete work. The court emphasized that the four-count segment was not protectable because it comprised only a "small component" of Hanagami's overall five-minute routine and was closer to an uncopyrightable "short" dance routine. We reject this conclusion for several reasons.

First, "no bright line rule exists as to what quantum of similarity is permitted before crossing into the realm of substantial similarity." *Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987). That means that, "[e]ven if a copied

portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." *Id.*; *see also* 4 Nimmer on Copyright § 13.03 (2023). In the music copyright context, "an arrangement of a limited number of notes can garner copyright protection." *Swirsky*, 376 F.3d at 851 (holding that seven notes of the first measure of a song's chorus were sufficient to find substantial similarity). In *Skidmore v. Zeppelin*, for example, we held it was a jury question whether the opening notes of *Stairway to Heaven* were substantially similar to an eight-measure passage of the song *Taurus*. *Skidmore*, 952 F.3d at 1059; *see also Baxter*, 812 F.2d at 425 (rejecting the argument that a six-note sequence of a song would be unprotectable as a matter of law); *Horgan*, 789 F.2d at 162–63 (collecting Second Circuit cases in which copyright infringement was found based on a small amount of copied material).

To be sure, copying that is *de minimis* is not actionable. 4 Nimmer on Copyright § 13.03 (2023). In the literary realm, copying one sentence of a plaintiff's work is ordinarily *de minimis*. *Id.* And in the context of music copyright, it is safe to say that "a similarity limited to a single note never suffices." *Id.*; *see also Skidmore*, 952 F.3d at 1059 (noting that we have never found similarity based on a three-note selection or "a four-note sequence common in the musical field").

Nevertheless, the proper inquiry does not turn on the mere length of the copied material. *See* 4 Nimmer on Copyright § 13.03 (2023). "The question in each case is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work," which is an "evaluation [that] must occur in the context of each case, both qualitatively and quantitatively." *Id.* If the copied

portion is deemed significant, then the defendant cannot avoid liability simply because it is short. *Id.* (rejecting the oft-repeated maxim that copying three bars from a musical work could never constitute infringement). Moreover, Epic does not argue that the alleged copying is *de minimis*.

The district court erred by ruling that, as a matter of law, the Steps are unprotectable because they are relatively brief. Hanagami has more than plausibly alleged that the four-count portion has substantial qualitative significance to the overall Registered Choreography. The four counts in question are repeated eight times throughout the Registered Choreography, corresponding to the chorus and titular lyrics of the accompanying song. Hanagami alleges that the segment is the most recognizable and distinctive portion of his work, similar to the chorus of a song. *See Swirsky*, 376 F.3d at 851. Whether or not a jury would ultimately find the copied portion to be qualitatively significant is a question for another day. We conclude only that the district court erred in dismissing Hanagami's copyright claim on the basis that Epic allegedly infringed only a relatively small amount of the Registered Choreography.

Second, we are not convinced that the four-count segment is a "simple routine," as the district court implied. It is true that Congress indicated that simple routines do not warrant copyright protection. *See* H.R. Rep. No 94-1476, at 53–54 (1976). And the Copyright Office advises that it "cannot register a claim to copyright in social dances or simple routines." Compendium § 805.5(B). But here, Hanagami plausibly alleged that the Steps are more than "a few movements . . . with minor linear or spatial variations." Short does not always equate to simple. Beyond the relatively brief duration of the copied steps, there is no evidence to suggest that the choreography is simple. It

appears that the allegedly copied portion is far more complex than other routines the Copyright Office has deemed uncopyrightable, like a "celebratory dance in the endzone" consisting of "a few movements of the legs, shoulders and arms," or the gesture of using one's arms to spell out the letters "USA." Compendium § 805.5(A). And there is no indication that the segment of choreography is an "adapted social dance" or a dance designed to be performed by the public. Hanagami plausibly alleged that the four-count portion is a complex, fast-paced series of patterns and movements that involves the whole body and is performed by highly-trained dancers. Even without the rest of the Registered Choreography, the Steps alone could satisfy many of the elements of a choreographic work as defined in the Compendium. *See* Compendium § 805.2(A)–(F).[13] In any event, it is not up to us at this stage of the litigation to determine the complexity of the Steps. Further discovery and expert testimony may shed more light on this question.

Epic also urges us to defer to past decisions from the Copyright Office and consider whether Hanagami could receive a copyright for the four-count segment of choreography, standing alone. We recognize that the Copyright Office must make discretionary decisions about the length and complexity of choreography that can be copyrighted, taking care to leave the "building blocks" of choreographic expression in the public domain. Copyrightable choreography and uncopyrightable dance

---

[13] As noted above, the Compendium suggests that choreographic works typically contain one or more of the following elements: rhythmic movement in a defined space, compositional arrangement, musical or textual accompaniment, dramatic content, presentation before an audience, and execution by skilled performers. *See supra* Section A. There may also be other relevant elements.

exist on a continuum, on which the four-count portion of Hanagami's choreography may well fall somewhere in the middle. *See* Compendium § 805.5(B)(1).

But the relevant question is not whether Hanagami could re-register only the four-count segment of choreography with the Copyright Office. The question is whether Epic unlawfully appropriated that portion from Hanagami's Registered Choreography. Even if the Copyright Office would not issue a copyright for the allegedly copied material alone, that would not automatically defeat Hanagami's copyright claim.

## 2. Thin vs. Broad Copyright Protection

Hanagami raises a final issue on appeal. Up to this point, we have simply assumed that the "substantial similarity" standard applies in comparing Hanagami's choreography and Epic's emote, following the district court's analysis and the parties' briefing. But the standard for demonstrating similarity varies depending on whether the work in question is entitled to "thin" or "broad" copyright protection. If a work contains only a narrow range of possible expression and a limited range of creative choices, then it has "thin" copyright protection, and infringement occurs only if another work is "virtually identical" to it. *Mattel*, 616 F.3d at 913–14. On the other hand, for a work that enjoys a wide range of possible expression and broad creative choices, the work merits "broad" copyright protection, and a work will infringe if it is "substantially similar" to the subject work. *Id.* at 914. A court must decide whether a work has "thin" or "broad" copyright protection to determine the degree of similarity that must be proven. "The standard for infringement—substantially similar or virtually identical—

determined at the 'extrinsic' stage is applied at the 'intrinsic' stage." *Id.*

Our caselaw illustrates this point more aptly. Because "there are gazillions of ways to make an aliens-attack movie," copyright protection for such a movie would be "broad." *Id.* at 913–14. A highly stylized photograph of Michael Jordan on a grassy knoll dunking a basketball in a grand jete pose similarly received broad protection because there were a "much wider range of creative choices available in producing it." *Rentmeester*, 883 F.3d at 1120. In contrast, "there are only so many ways to paint a red bouncy ball on blank canvas," so copyright protection for that image would be "thin." *Id.* at 914. Similarly, commercial photo shots of a vodka bottle received thin protection because there are few creative choices the photographer could make in crafting such an image. *See Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003).

Hanagami argues the district court erred in suggesting that choreographic works are entitled to only "thin" protection. We do not read the district court's decision in such a manner. Although the district court did not state that Hanagami's choreography received "broad" protection, "[b]y adopting the 'substantially similar' standard, the district court afforded" it broad protection. *Mattel*, 616 F.3d at 914. Nonetheless, Hanagami urges us to go a step further and hold that choreographic works are *always* subject to broad protection because of the wide range of creative choices available to a choreographer in composing a work.

We decline to do so. We do not address the thin versus broad copyright protection issue, either with respect to Hanagami's claim or to choreography more broadly. Because we remand this case for further proceedings, the

district court will have a better opportunity to assess the appropriate level of copyright protection for Hanagami's claim with the benefit of a more complete record. At the next stage of proceedings, the court may decide whether thin or broad copyright protection applies in the first instance.

## CONCLUSION

For the foregoing reasons, we reverse the district court's dismissal of Hanagami's copyright claims against Epic. We remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**